**Bechtel v. Bechtel**

*David S. Sobotka*, for plaintiff.
*Marissa Joan Brumbach*, for defendant.

BUCCI, *J.*, February 19, 2014—

## FINDINGS OF FACT

1. The plaintiff, Jonathan R. Bechtel (hereinafter, "father"), age 39, and the defendant, Christine Bechtel, (hereinafter, "mother"), age 42, are the natural parents of two minor children, Jonathan Bechtel, born November 8, 2008 and Adalin Bechtel, born March 31, 2010, (hereinafter referred to collectively as "the children" or individually by name).

2. The parties were married on September 16, 2006 in Berks County, Pennsylvania, separated in June, 2011 and were divorced in the Court of Common Pleas of Berks County on January 6, 2012.

3. Prior to the parties' separation they resided together with the children at 436 North Church Road, Wernersville, Berks County, Pennsylvania.

4. After the parties' separation, father continued to reside in the marital residence from June 11, 2011 to January 2012, at which point he relocated to the children's paternal grandparents' residence at 1695 Morgantown Road, Berks County, Pennsylvania.

5. In June 2011, mother relocated her residence to Philadelphia, Pennsylvania, near her extended family.

6. Approximately one year ago, mother again relocated her residence to reside with her paramour in Lehigh County, Pennsylvania.

7. On November 16, 2011, the parties entered into a shared custody agreement for the children generally consisting of a week-on, week-off schedule, which they had been doing since the date of separation in June of 2011.

8. The parties continued to follow the shared custody agreement even after mother relocated to Philadelphia in 2011 and then when she relocated to Lehigh County in January 2013.

9. Both parties acknowledge that the current custody arrangement is not in the children's best interest because there is a lack of continuity and because the 50/50 shared custody arrangement has come to its natural conclusion given the fact that the children will be starting school in the fall of 2014.

10. Since January 2013, mother has resided in a four bedroom home at 17 Witman Drive, Breinigsville, Lehigh County, Pennsylvania with her paramour, Hugh Gallagher, Mr. Gallagher's two sons, ages 14 and 16, and mother's daughter from a previous marriage, Kelsey Cooke, age 16, and the children.

11. Father currently resides with the children, and the children's paternal grandparents, Douglas and Brenda Bechtel (hereinafter collectively referred to as "paternal grandparents" or individually as "paternal grandfather" and "paternal grandmother," respectively).

12. Mother's currently rents her home on a month-to-month basis.

13. Father's home is owned by paternal grandparents and consists of six acres of land in Cumru Township, a suburb of Reading, Pennsylvania, in the Governor Mifflin School District. The home is 4,200 square feet with separate in-law quarters.

14. Father has been employed as general manager

of his family's business, Rentschler Auto Center, since 1998. The business is located approximately 5-10 minutes from father's current residence. Father's work hours are generally Monday through Friday from 8:00 a.m. to 5:00 p.m., with a high degree of flexibility.

15. Mother has been employed on a full-time basis since October 2013 at D.S.S. Computer Company in Wyomissing, Berks County, Pennsylvania, which is approximately 10 minutes from father's residence. Mother commutes approximately 45 minutes or more from her current residence to work, leaving home by at least 7:00 a.m. and returning home at 5:45 to 6:00 p.m.

16. Mother testified that her daily commute to work usually takes approximately 35 minutes. We do not find her testimony credible in this regard. The court is very familiar with Route 222 between Wyomissing, Berks County and Breinigsville, Lehigh County. Route 222 north of Reading is a notoriously congested 2 or 3 lane highway with long bottle neck at key cross-roads. We believe mother's daily commute time is longer than she claims.

17. From January 2013 to March 2013, mother commuted to work from Lehigh County to Philadelphia Monday through Friday, with a one-hour commute each way.

18. Mother is taking on-line college courses through Cedar Crest College.

19. Mother testified that she intends to obtain an associate's degree, which will require approximately 160 credits, and she indicated that she is just commencing this education. She will be taking additional classes in the future.

20. The children, while in the custody of father, have been enrolled in the Brecknock Academy day care program located a few minutes from father's home.

21. The children, if in the primary custody of father, will attend the Governor Mifflin School District.

22. Father has a large extended family in the Berks County area including paternal grandparents, with whom he and the children reside. In addition to paternal grandparents, numerous cousins and an aunt live nearby.

23. Paternal grandmother works part-time as a substitute teacher and spends significant quality time with the children. She is a certified elementary school teacher.

24. Paternal grandfather works as a manager at Threshold of Berks County, which employs persons with disabilities, and there he has a flexible work schedule. As such, he also spends quality time with the children, including making pancake breakfasts for the children every Saturday morning.

25. The children's ninety-one-year old great-grandmother, father's paternal grandmother, had resided with father and paternal grandparents until September of 2013, when she passed away. She also spent time with the children.

26. Father's maternal grandparents, the children's other great grandparents, reside approximately 15 minutes from father's residence. Father and the children have dinner with these great grandparents every Wednesday evening. Father testified that he has been doing this since he was a child.

27. The children have other extended paternal family in the area, including an aunt and uncle nearby in West Chester, Pennsylvania.

28. Father has resided in Berks County his entire life. Father has many friends and acquaintances in the area.

29. The children have resided in Berks County their entire lives and have many relatives and friends as a result of their residing in Berks County since their births and attending preschool near father's residence.

30. Father and the children are very close to his family and they regularly socialize, take family meals together and attend church together every week.

31. Mother's extended family resides in the Northeast Philadelphia area approximately 1-1 ½ hours from mother's current residence.

32. Mother relocated to Philadelphia after the parties' separation in June of 2011 in order to be close to her extended family.

33. Mother now resides more than an hour away from her extended family.

34. Mother's child from a previous relationship, Kelsey, has been forced to change school districts four to five times due to mother's having been divorced on two occasions and having relocated her residence on at least six occasions.

35. During the parties' marriage, mother worked part-time and her employment was home-based, which allowed her to be the primary caretaker of the children prior to the parties' separation in 2011 when their eldest son was 2 ½

years old.

36. Mother's current paramour, Mr. Gallagher, previously worked in Wyomissing, Berks County, Pennsylvania.

37. Mr. Gallagher worked for Berks & Beyond from April 2013 until November 2013, commuting Monday through Friday from Lehigh County to Wyomissing. Prior to that, he worked in Lehigh County.

38. Mr. Gallagher and mother have indicated they have no intention of relocating their residence.

39. Mr. Gallagher's two sons, ages 16 and 14, attend school in Lehigh County.

40. Mother's daughter, Kelsey, currently attends Parkland School District in Lehigh County. Kelsey lived with the parties prior to separation and relocated with mother, requiring her to switch schools.

41. During 2013, mother used a babysitter/private daycare in Lehigh County for not only child care during the day, but in the early morning and evening hours when both mother and her paramour were commuting from Lehigh County to Berks County for their employment.

42. Mother has occasionally left the children in the sole care of the children's 16-year-old half-sister Kelsey.

43. In July 2013, mother called the police to report that while she took another child to football practice and her car for an oil change, she left the children in the care of Kelsey, who was asleep when mother left. In mother's absence, then-four-year-old Jonathan went missing from mother's home for approximately three to four hours.

44. Jonathan was placed in significant danger when he wandered out of mother's residence totally unsupervised, during which time he apparently walked across the public street to a neighbor's home and was missing for several hours causing mother to call police.

45. Mother and her paramour improperly discipline the children by causing them to eat hot sauce as a disciplinary measure.

46. Mother fails to inform father about certain fundamental parenting issues about which father has a right to know and decisions in which father has a right to participate, such as mother having the children baptized in the Catholic church.

47. Similarly, mother recently changed the children's long-standing pediatrician, unilaterally and without notifying father.

48. Father's extended family life can best be described as the epitome of a stable, harmonious, tranquil life grounded in the family tradition of living and working together.

## CONCLUSIONS OF LAW

1. Actions in child custody are decided under the Pennsylvania Child Custody Act, 23 Pa.C.S.A. §5321 *et. seq.* and the decisional law that flows therefrom.

2. The court has jurisdiction of the parties, the child and the custody issues in this case. *See* 23 Pa.C.S.A. §5422

3. "It is axiomatic that the paramount concern in any child custody proceeding is the best interests of the child." *Costello v. Costello,* 446 Pa. Super. 371, 375, 666 A.2d

1096, 1098 (1995). *Kirkendall v. Kirkendall*, 844 A.2d 1261, 2004 Pa. Super. 55 (2004) ("The best interests of the child is our bedrock in this determination").

4. "Such a determination, made on a case-by-case basis, must be premised upon consideration of all factors which legitimately have an effect upon the child's physical, intellectual, moral and spiritual well-being." *Alfred v. Braxton*, 442 Pa. Super. 381, 385, 659 A.2d 1040, 1042 (1995)(internal quotations omitted); *Jackson v. Beck.* 858 A.2d 1250, 1252 (Pa. Super. 2004).

5. A parent's ability to care for a child must be determined as of the time of the trial, and not based on past behavior at an earlier point in time. *Hall v. Mason*, 462 A2d 843 (Pa. Super. 1983); *Bresnock v. Bresnock*, 500 A.2d 91 (Pa. Super. 1985).

6. The Child Custody Act enumerates sixteen (16) factors that this court must consider in determining whether to grant or deny any form of custody. *See* 23 Pa. C.S.A. §5328, discussed more fully below.

7. The court is required to consider all the factors set forth in 23 Pa. C.S.A. §5328. *See* 23 Pa. C.S.A. §5337(h); *JRM v. JEA*, 33 A.3d 647, 652 (Pa. Super. 2011) ("*All* of the factors listed in §5328 are required to be considered").

## DISCUSSION

The court conducted a full and thorough custody trial on January 15, 2014. During the trial, we heard and considered the testimony of mother, mother's paramour, father, and paternal grandparents. We have also read and considered the parties' answers to the "custody

questionnaire" and various email communications between the parties submitted as exhibits. There was no testimony from members of mother's extended family.

We begin by observing that this is an unfortunate conflict over who should have primary custody between two equally mature, competent, caring parents who are fully committed to the welfare of the children. Both have equally shared childcare responsibilities for the past 2 ½ years. Both parents gave testimony confirming their recognition of the other parent's admirable parenting skills. For all of these reasons, we see this as a dispute between two equally fit parents. Therefore, because the distance between the parties necessitates the designation of a primary home rather than the continuation of the current 50/50 arrangement, the foremost issue before the court is which parent can best provide the children with a stable, safe, healthy, harmonious home environment, based on the overall circumstances, in which the children can grow, thrive, and flourish in all respects.

The parties were married in September 2006 and separated in June 2011. Mother testified the cause of the breakdown of the marriage was "financial." This was mother's second marriage and father's first and only marriage. Following separation, father continued to reside in the marital residence for six months, after which he moved in with his parents, the paternal grandparents, where he continues to reside today. Father has resided in Berks County his entire life. Following separation, mother, along with her daughter from a previous marriage, relocated to Northeast Philadelphia where mother has extended family.

Mother lived and worked full time in the Northeast Philadelphia area until she and her daughter again moved, in January 2013, to her current paramour's residence in Breinigsville, Lehigh County. Mother commuted from her paramour's residence in Breinigsville to Northeast Philadelphia for approximately three months.

Since October 2013, mother has been employed at a computer firm in Wyomissing (a suburb of Reading), Berks County which is an approximately a 45-minute commute from mother's residence. Father's residence is approximately 10 minutes from mother's current employment.

Father has been employed in the family business for many years. Father is the third generation operating the family's successful automotive business. Father lives ten minutes from his place of business.

Since their separation in June of 2011 when the children were 1 ½ and 2 ½ years old, respectively, the parties shared custody of the children on an equal basis, exchanging custody week by week. Therefore, for the past 2 ½ years, both parents have performed all parental responsibilities on an equal basis. To date, with some minor glitches, the parties have cooperatively co-parented the children, with only minor discord on occasion.

However, the parties now come before the court because both parties realize that, due to the distance between their residences, the 50/50 custody arrangement cannot continue when the elder of the children begins full-time kindergarten in the fall of 2014. In anticipation of the children enrolling in school, both parties seek primary custody. Continuing

the current shared-custody arrangement would be feasible, and perhaps desirable, if mother lived in closer proximity to father's residence, which, coincidently, is very close to her place of employment.

Unfortunately, rather than remaining close to the children's father and to their previous residence, mother chooses to reside with her paramour and his teenage children in Lehigh County. Mother testified that she has no intention of returning to Berks County.

Mother contends that she should be granted primary custody of the children so the children can reside with her in Lehigh County with her, their 16-year-old half-sister, mother's paramour, and his two teenage sons. Mother indicated that she wants the children to attend the Parkland School District rather than the Governor Mifflin School District, which is the school district where father resides. Mother believes that Parkland is a superior school to Governor Mifflin but she presented little, if no, solid evidence to support this contention other than her research on the internet and speaking to other parents. Mother believes that she is the better parent and that she can provide support, encouragement and guidance to help the children thrive and flourish. Mother's primary argument in support of her bid for primary custody is her claim that she has been the children's primary caretaker since birth. Mother stated this at trial and several times in her custody questionnaire. However, this is not completely accurate in light of the fact that mother and father have shared all custodial and parental responsibilities on a 50/50 basis since their separation in June 2011. It is true that mother was the children's primary caretaker prior to the parties'

separation when their eldest son was 2 ½ years old and their daughter was 15 months old. For the past 2 ½ years, however, father has been equally responsible for the care and custody of the children. For example, until very recently, the children's pediatrician was in Berks County and both parents attended medical appointments with the children.

Father contends that he should have primary custody because he can provide a more stable, supportive, multi-generational family environment in which to raise the children. Father presented compelling evidence that he has the strong support of paternal grandparents and that the children are all part of a very close-knit, traditional family who live together, share family meals together, play together and attend church together. Father points out that he has a stable job in a stable, long-standing family business. He lives with his parents in a 4,500 square foot home on 6 acres only 10 minutes from his work. If father has primary custody the children will attend the Governor Mifflin School District. It is the same school district that father attended school while growing up. In sum, father presents a picture of a secure, stable, safe, traditional multi-generational family life environment, which is far different than the "family life" environment presented by mother. We make this observation for several reasons. First, mother admitted that, as a result of her multiple relocations, her teenage daughter of another marriage has been enrolled in four different school districts. Mother, within the past year, relocated away from her extended family in Philadelphia to take up residence with her current paramour in a recently-rented home, which is rented on a month-to-month basis. Therefore, within the

past year, the children began living with two teenage boys with which they had only recently become acquainted. Mother presented no evidence whatsoever that her extended family in Northeast Philadelphia support her and the children in any way, such as providing childcare or otherwise. Mother testified that she and the children visit her relatives in Northeast Philadelphia only about once a month.

Mother contends that she and her new paramour now have a new happy "blended family" which may be true. However, this is a relatively new relationship with a man she began dating 1 ½ years ago. Whether or not this will last or whether mother will relocate again as she has done in the past is an issue for the court to consider.

Father and the children are clearly fortunate to be part of and have a close bond with father's extended family, in particular paternal grandparents. The evidence demonstrates that father's family places considerable emphasis on having a peaceful, loving family life. They have shown that they place family unity and harmony above pursuit of material things. They impressed this court with their calm, forthright demeanor and their attitude towards each other and the children. We believe this is a family that embraces unity and happiness to the exclusion of other concerns. This is best exemplified by paternal grandfather's decision to leave the family business and turn over the "reigns" to father to avoid family conflict. Paternal grandfather instead pursued other worthwhile employment: working with handicapped adults. All too often, family businesses are afflicted with internal family competition and resulting family discord. We see just the

opposite in father's family. We cannot think of a better environment in which to raise young children.

Although, in this case as in all custody matters before us, we consider all of the statutorily-mandated factors, stability may be the main issue in this particular case. Here, father presents an outstanding, remarkably stable family, residential and work history in stark comparison to mother, whose history is characterized by upheaval and disruption.

Due in part to father's stable history, the children have a very strong bond with paternal grandparents, who have been very involved in the children's lives. To grant mother primary custody would be destructive of this family structure. To remove the children from father's residence would be very detrimental to the children. Mother has acknowledged by her agreement to 50/50 custody since separation that father is a competent, capable parent and that his close family is a healthy environment for the children. We cannot overstate the importance of father's extended family in the children's lives. Paternal grandmother is a strong, positive influence in the children's lives. She impressed this court with her knowledge of the children's lives, her contribution to their development, and we are impressed with her teaching credentials.

Paternal grandparents confirmed that, despite their living arrangement, father has performed the primary parenting responsibilities with respect to the children. Demonstrating an unusually harmonious multi-generational living arrangement, paternal grandmother testified that they all sit down to a family meal every day. Paternal grandmother primarily prepares meals, but

paternal grandfather said everyone shares in preparing family meals.

Paternal grandparents impressed us as very warm, caring, loving, affectionate people, and paternal grandfather described his role as "mentor" to the children.

Mother testified that she thought that the children needed consistency and stability in their education and friendships, but mother has shown very little consistency or stability in her life and little awareness of how her life impacted her daughter, Kelsey, who has attended four school districts. Mother moved to Philadelphia away from the children and the children's father. We observe that mother testified that the reason for separation was financial; not abuse, not incompatibility. It is understandable that mother moved to be close to her extended family, but the move nonetheless took the children an hour from father, despite the agreed-upon 50/50 custody agreement. Then, in January 2013, mother moved in with her new paramour which was an hour from her employment in Philadelphia and a great distance from the children's father in Cumru Township, Berks County. We feel this demonstrates a pattern of mother putting her needs in front of the needs of the children. Her current living arrangement may be just as temporary and uncertain as her previous arrangements, particularly in light of the fact that she rents on a month-to-month basis, that her employment is not close to her current residence, and that she and her paramour are not married. To date, the hallmark of mother's life is to pick up and move based on her immediate situation.

Conversely, father's very supportive extended family is a model of a happy, close, loving family who lives

together in harmony, plays together, shares family meals daily together, attends church every Sunday together, and even has pancakes every Saturday morning prepared by paternal grandfather. We are convinced that the children will benefit immensely from being raised in father's household with the support of paternal grandparents.

In reaching our decision, in addition to the above, we have considered all of the above in light of the statutory factors, as set forth in the next section. *See* 23 Pa. C.S.A. §5328.

## STATUTORY FACTORS

1. *Which party is more likely to encourage and permit frequent and continuing contact between the child(ren) and another party.* There is no evidence to suggest that either party has attempted to prevent the other from having frequent contact with the children in light of their 50/50 shared custody arrangement, which was entered into by mutual agreement. We were impressed by father's testimony at trial when asked if he regularly allows the children to speak with mother. He replied that he schedules a time, on almost a daily basis, for the children to speak to mother and he ensures that there are no distractions "so they have quality time to speak to their mother." We were equally impressed with father' response to Question 38 of the court's custody questionnaire concerning his view of mother's future role in the care and upbringing of the children. He wrote: "Christine has played an equally huge part of our children's upbringing... I see her as an equal partner in the co-parenting of our children." This confirms our conclusion that if father is granted primary custody he will actively and affirmatively promote

mother's relationship with the children and that he will permit and encourage the children to have quality time with mother, even above and beyond what any court order may dictate. On the other hand, in mother's response to Question 38, she repeats her inaccurate description that she has been the children's primary caregiver, though she does acknowledge that father is a "loving, nurturing and attentive father. Based on all the evidence presented, we conclude that father would be more likely to encourage frequent contact between mother and the children than mother would between father and the children.

2. *Whether there is past or present abuse by a party or member of the party's household and whether there is a continued risk to the child(ren).* There are no allegations of abuse by either party, or member of either party's household, in this case.

3. *The parental duties performed by each party.* There is no dispute that mother was the children's primary caregiver prior to the parties' separation in 2011. Nor is there any doubt that, post-separation for the past two-and-a-half years, the parties have equally shared all parenting responsibilities, including such things as attending the children's medical and dental appointments. Father's position in the family-owned business allows him more flexibility and more time to attend to the children's daily needs. Mother's long commute to work and more rigid schedule requires her to leave home early in the morning and return later in the evening. This will become more of an important factor as the children grow older and start participating in extra-curricular activities. In addition to allowing for flexibility, father's business is in close

proximity to cather's home and schools, and this will facilitate father's participation in the children's school and extracurricular activities. For example, father testified that he helps the children dress in the morning, cooks them breakfast, and transports them to and from day care each day. Mother, on the other hand, testified that she will need to rely on her paramour to see the children off to school in the morning.

4. *The need for stability and continuity in the child(ren)'s education, family and community life.* This may be one of the strongest factors in father's favor. Father, together with his extended family, can be best characterized as a model of stability which stands in stark contrast to mother's history. Father is the third generation to manage the family business, where he has worked for the past 16 years. Mother and her paramour have held multiple jobs in multiple cities during just the past several years. Father has resided in Berks County his entire life and will no doubt continue to do so for the foreseeable future. Mother has relocated multiple times, most recently relocating from Northeast Philadelphia to Breinigsville, Lehigh County. As a result of mother's multiple marriages and relationships, mother's other daughter, age 16, has had to change school districts four or five times. We are afraid that, despite mother's best intentions, her current living arrangement may again change and require her to relocate once again. Granting father primary custody gives this court confidence that the children will not live a transient lifestyle and that they will, in all likelihood, remain in the same school district for a long time. If mother would be granted primary custody we would not be so confident that the children would have the same degree of stability

they would have in father's household with respect to their family life, their social and community life, their religious experience and their academic life. The overall, long-term stability we observe in father and his family is clearly an important factor which tips the scales in father's favor.

We are especially impressed with the testimony of paternal grandmother who is a certified elementary school teacher. She described the creative school-type activities she does with the children such as reading, drawing, coloring, et cetera. In short, she does much more than simply "spend time with them." Her time with the children is very productive and contributes significantly to their intellectual development. The very important role paternal grandmother plays in the children's lives cannot be overstated.

5. *The availability of extended family.* Again, this factor strongly favors granting father primary custody of the children. Father and the children have a strong and close relationship with paternal grandparents and the children's great grandparents. The fact that father and the children have dinner every Wednesday night with their great grandparents, a tradition than began when father was five, is emblematic of the warm nature of father's extended family.

The children will benefit immensely growing up in this type of environment surrounded by a close, loving, nurturing extended family. Again, the nature of father's extended family stands in stark contrast to the children's relationship with mother's extended family. Mother's extended family, of which we know very little, reside an hour away from mother's current address. Mother testified

that she and the children visit her family in the Philadelphia area about once per month. We have not heard any other evidence of mother's extended family's involvement or relationship with the children. Mother essentially removed the children from the proximity of their maternal family when mother moved to her paramour's residence in Lehigh County.

6. *Any sibling relationships.* The children have an older half-sibling living in mother's residence. Generally, siblings, even half-siblings should not be separated. However, we do not think this is an important factor given the age difference and the fact that the half-sibling will soon be an adult.

7. *The preference of the child(ren), where appropriate.* We did not speak to the children in light of their tender ages.

8. *Any attempts of a parent to turn the child(ren) against the other party.* Both parties have fostered a good relationship with the other. We have heard no evidence of either party disparaging the other in presence of the children. We compliment them on this.

9. *Which party is more likely to maintain a loving, stable, consistent and nurturing relationship with the child(ren) adequate for their needs.* Both parties are totally committed to their parental responsibilities. Both are mature, competent, capable, caring, loving parents. Mother acknowledged in her trial testimony that father has a "very nurturing" parenting style.

10. *Which party is more likely to attend to the daily, physical, emotional, developmental, educational and*

*special needs of the child(ren).* Both parents recognize the importance of enrolling the children in church services. Mother very recently, but without father's knowledge or consent, had the children baptized in the Catholic Church. Father was raised in the Church of the Brethren and he and his parents attend church every Sunday.

Mother sought out a special assessment of son Jonathan because she was concerned about his age appropriate behavior and development. We believe this shows that mother pays close attention to the children's well-being and development.

Otherwise, this factor favors father because of father's self-employment, which is located five to ten minutes from father's residence. The practical reality is that father can be available to attend to the children's needs much more than mother. For example, father currently prepares breakfast every morning for the children and he drives the children to and from day care. The location of mother's work and her work schedule will hamper mother's efforts to do the same.

11. *The proximity of the residences of the parties.* The proximity of the residences impacts this case to the extent that is renders 50/50 shared custody impossible. Mother, on two separate occasions, made the decision to live over an hour from father's residence in Berks County. The first time was upon separation in 2011 when she returned to Northeast Philadelphia and again in January 2013 when she moved to her paramour's residence in Lehigh County. In reaching our decision, we do not intend to punish mother for moving, but we simply note that, as a result of her relocation so far away from father, she has made

a continuation of a shared 50/50 custody arrangement impossible.

12. *The parties' respective abilities to care for the child(ren) or to make appropriate child care arrangements.* This factor strongly favors granting primary custody to father because paternal grandparents with whom father resides are more than willing to, and eminently capable of, caring for the children in father's absence. Paternal grandmother, with her background as an elementary school teacher and her especially warm, nurturing personality witnessed by us in court is a particularly important resource for father and the children. Mother must rely on commercial day care providers, her paramour, or her 16-year-old daughter. Neither commercial day care providers or her paramour have the long-standing history or familial bond with the children that paternal grandparents enjoy. And, although the 16-year-old sister is family, we are mindful of the unfortunate, serious incident that occurred in July of 2013 when mother left the children in her care. Mother admits that everyone, including the 16-year-old, was sleeping when she left the house to take her paramour's son to football practice and their vehicle to have the oil changed. In her absence, and apparently while the children's half-sister remained sleeping, Jonathan left the residence unattended. When his absence was discovered the police were called to search for him. He had apparently wandered off to a neighbor's house which required him to cross a public street, and had been missing for approximately two hours. This appears to be an isolated incident but we would be very surprised if such an incident ever occurred at father's residence considering the responsible care provided by paternal

grandparents.

13. *The level of conflict between the parties.* Both parties were very complimentary of each other's parenting skills at time of trial. Until very recently, the parties mutually agreed to a 50/50 custody arrangement. Thus, we are confident that they will continue to have the willingness and ability to cooperate with each other to continue to co-parent the children in a healthy, constructive manner.

14. *Any history of drug or alcohol abuse by the parties.* There is no evidence of drug or alcohol abuse by either party, and this is not a consideration in determining custody of the children.

15. *The mental and physical condition of the parties.* Both parties are vibrant, physically and mentally healthy mature adults. Father suffers from sleep apnea for which he takes physician-prescribed medication to aid sleeping. The health of the parties is not a factor in this case.

16. *Any other factor that impacts the best interests of the child(ren).* There are no additional factors which have not been addressed, which impact the best interests of the children.

## FINAL CUSTODY ORDER

And now, this 19th day of January, 2014, following a custody trial, it is hereby ordered and decreed that Jonathan R. Bechtel, (hereinafter "father") and Christine Bechtel, (hereinafter "mother") shall have shared legal custody of the minor children, Jonathan Bechtel, born November 8, 2008 and Adalin Bechtel, born March 31, 2010, (hereinafter "the children").

The parents shall share physical custody of the children as follows:

1. Father shall have primary physical custody.

2. During the school year, commencing the date of this order, mother shall have partial physical custody on alternate weekends from Friday after school or, if there is no school or the children are not in school, at 3:30 p.m. until Monday morning when mother transports the children to school or day care. Mother shall also have custody every Wednesday evening and every other Monday evening, for a period not to exceed three hours, and this shall be exercised within 20 minutes of father's residence in Berks County.

|        | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|--------|--------|--------|---------|-----------|----------|--------|----------|
| WEEK 1 | Father | Father (Mother for 3 hours) | Father | Father (Mother for 3 hours) | Father | Father Mother | Mother |
| WEEK 2 | Mother | Mother Father | Father | Father (Mother for 3 hours) | Father | Father | Father |
|        |        |        |         |           |          |        |          |

3. During the summer, commencing in June of 2014, the parties shall share custody on a 50/50 basis, exchanging the children every seven days.

4. Mother and father shall alternate custody of the children on the following holidays: Easter, Memorial Day, July 4th, Labor Day and Thanksgiving. Mother shall have custody on Easter 2014, and the parties shall alternate holidays thereafter.

5. For Christmas, father shall have custody on Christmas

Eve until 2 p.m. on Christmas Day. Mother shall have custody from 2 p.m. on Christmas day until January 1.

6. Mother shall have custody for Mother's Day and father shall have custody for Father's Day each year. Custody shall be from 10:00 a.m. until 7:30 p.m. Both parties shall have custody for at least five hours on the children's birthday

7. Both parents shall have the right to two non-consecutive weeks of vacation with the children. Each party shall provide the other party with at least sixty (60) days advance notice of their choice of weeks under this paragraph. Mother's choice of weeks shall have priority in even years and father's choice of weeks shall have priority in odd years.

8. The parties shall share transportation. The parent whose period of custody or partial is commencing shall pick up the children at school or the other parent's residence except when it is the parents' responsibility to take the children to school in the morning following their period of custody or partial custody as set forth herein.

9. Appendices A, B and C are attached and made a part hereof.

10. This is a final custody order.